JIM LANGSTON ET AL. V. G. H. MAXEY.

No. 6576.

1. **Homestead.**—When the owner of a parcel of land in a town or city occupied by him as the homestead of his family permanently devotes a part thereof to a purpose inconsistent with its use as a part of the homestead and permanently abandons such use, the parcel so set apart for other than homestead uses ceases to be a part of the homestead. See facts.

2. **Same.**—Though no divisional lines may have been run separating the original parcel of ground into lots, the building of a dividing fence between the portion of ground permanently devoted to other than homestead purposes and that part still occupied for homestead use sufficiently marks the portion protected as a home by the Constitution and that portion which has been abandoned as part of the homestead and which has become thereby subject to forced sale. See opinion and statement for facts held to constitute abandonment of part of lots once used as a homestead.

APPEAL from Johnson.    Tried below before Hon. J. M. Hall.

The following was the testimony of appellee Maxey:

"Is sixty-nine years old, and resides upon property in controversy; family consists of wife, self, and a little boy; his homestead consists of a part of out block No. 2 in city of Cleburne; bought and resided on it in July, 1867; bought the whole block and enclosed it with a fence in 1867, and built near center of it, fronting on head of Caddo Street, and has always resided on the block since.    After I bought I sold a lot off the east end of the block to Mrs. Armstead, and after that I sold off to A. A. Barnes a lot off the west end of the block and retained that portion lying between the Beard and Barnes lots; the part retained by me fronts on Willingham Street 212 feet [the plat shows 205] and runs back 210 feet.    This block has never been subdivided; the chain was never put to it.    Soon after I sold to Barnes I made a garden just west of the house in which I then lived and just east of the Barnes lot, the full length of the block, and built a fence north and south the length of the block and west of the house I was then occupying.    I built this fence to keep the chickens out of the garden, and had a gate made in this fence so I could get into the garden.    In 1888 Mrs. Pickett came to Cleburne and wanted to keep boarders and send her children to school.    The house I was occupying was not large enough for myself and wife and her family, and I built the house in which I now reside upon the spot I had used before then for a garden, and moved into it and have resided there since.    I rented the old house to Mrs. Pickett and boarded with her during the time she remained. After she left I rented the old house to Mrs. Muckleroy and we took our meals with her while she remained there.    She remained about six months and then I rented the old house to Parson Beverly.    I had up to that time been renting the place for eighteen dollars, but on account of he being a preacher I knocked off $2 a month.    He kept it about two years and then Mr. Alleridge rented it.    He paid me $14 a month.    After he left

it I rented it to Mr. Lyons, who has been renting it about a year at $16.50 a month.

"In 1879 I built another house on the block just southeast of the old house to rent to S. C. Walters, and he occupied it for two years. After he left I rented to Mayor and then to C. R. Porter, and after he left I rented it to others. Since last spring Mr. Wells, the present occupant, has been renting it. This house has rented at from $12.50 to $16.50 per month. During the time Walters occupied the house he put up a board fence from near the northwest corner of the house to the back part of the lot, and built a cow shed in the horse lot; but no fence was extended south till after Mr. Lyons went into the old house. He complained of Mayor's children bothering him, and I built the fence from the southwest corner of the new house south to the front fence, simply for the accommodation of Mr. Lyons. The fence between the old house and the Walters house begins at the front fence and runs back north to a point opposite the northwest corner of the house, and then an offset the distance of one panel to the southwest corner of the house, and then the fence begins about three feet from the northwest corner of the house and runs to the corner of the smoke house belonging to the old house, passing over the cistern and connecting with the cistern, leaving a pass-way over the cistern, and leaving the cistern so that water can be drawn from either side; and from northeast corner of smoke house the fence runs on back to north side of the block or southwest corner of the horse lot. This cistern was built by me when I built the old house, and have used drinking water out of it all the time since I moved into the house where I now reside except when it was dry last summer; and in getting water I pass through the gate in the fence between my residence and the old house.

"I have prepared a rough draft or sketch of my property, showing the position of the several houses and fences. [It will be found copied in the opinion.] The first house on the west side, as shown on the plat, is my residence, and the dotted line east of this is the old garden fence and is so marked, and the cross-mark in the line is the gate leading to the old house, and through this I pass to get my drinking water from the cistern. This piece of ground is about 90 feet front by 210 deep. The next house east on this plat is intended to represent the old house. This piece of ground is about 65 feet front by 210 feet back, and the round dot on the east of the old house is intended to represent the cistern. The house east of this is intended to represent the Walters house, and the dotted line the fence between the old house and the Walters house.

"This block has never been subdivided, and I have always claimed the whole of this part block as shown on this plat as my residence, and so claim it now. It is the only property I own on earth. I have no occupation and my only means of support is the rent from the old house and the Walters house. I have not had any occupation since W. L. Williams

beat me for county clerk.    I built the Walters house a purpose to rent out.
*    *    *    The guttering of the old was used also for supplying the cistern
until it was broken down.    The other portion of the fence separating the
old house and the Walters house from each other begins on the north side
of the cistern and runs in a northwest direction until it reaches the south-
east corner of the smoke house belonging to the old house, and then it
stopped again and then begins again at the northeast corner of the smoke
house and runs straight to the horse lot.    This fence was built by S. C.
Walters while he lived in the east house, out of piano boxes.    He built it
on his own accord; never asked my permission.    There is a small gate in
front of each house, but there is but one wagon gate, that is at the east
corner, next to Mrs. Baird's; you can enter that gate and go straight
north until you reach the horse lot at the southeast corner of it, and
there is a large gate through which you can pass into the horse lot, and
there in the west fence of the lot is another gate, as indicated on the draw-
ing, through which you can pass.    I then go across to the back portion
of that portion of the lot on which he resides, and that is the only way
by which you can reach that portion of the lot which is in the rear of the
house in which he lives."

Cross-examined.  " My residence cost me at first about $800, and since
then I have made some small additions to it; it consisted at first of four
rooms, but now has six; we have a flower pit and garden in front yard,
and a privy in back part of yard; we have a front gate entering Willing-
ham Street.    About three years ago when the city constructed its system
of waterworks I became a subscriber and had water brought to my house,
mainly to water my flowers, but we have used it also for general purposes;
when we felt like it we would get our drinking water at the cistern at the
old house, and we sometimes when there was no water in the cistern got
our drinking water from Captain Barnes.    We have resided exclusively in
the house where we now do for about nine years, and have at no time re-
sided in either of the other houses since 1878, when I rented to Mr. Lyon.
I did not reserve the right or privilege of getting water out of the cistern,
nor did I reserve any right to control the place.    The old house has five
rooms in it and a smoke house and privy in back yard; I have rented this
house out ever since I built my residence, but took my meals there a part
of the time as stated.    The Walters house cost me about $600, but some
small additions were made by Walters while he was there; he also built
a cow shed and a chicken coop; this place has a front yard and gate, and
also a large gate for wagons to pass back to lot; it has a back yard and
lot; have rented this place out since 1879 to various parties; built the
house for that purpose.    I have never reserved any rights or privileges
when renting this place, but all have used cistern.    All of these houses
front on Willingham Street.    Have never paid anything on judgment of
F. M. Sansom."

Re-examined. "At the time I built my residence and Walters house I was not in debt; that part of the block owned by me at the time I first built upon it was worth about $600, and is now worth with all three houses about $3000. The judgment upon which the execution in this case issued was obtained on a note executed by W. H. Graves and myself as sureties for S. C. Walters."

Two other witnesses (Lyons and Wells) testified, but their evidence disclosed nothing which is not contained in testimony of appellee, and there was no conflict of testimony.

*W. Poindexter*, for appellants.—The court erred in that part of his charge wherein this language is used, viz.: "The court instructs you that if you believe from the evidence that the plaintiff has built and is occupying as a home any certain house upon the land described in the petition, and if you further find that he has built any one or more houses upon said land not for the purpose of occupying the same as a home, but for the purpose of renting the same permanently so as to derive a revenue therefrom, and has separated the land on which such building, if any, is erected from the remainder of the land by building a fence around such house, then you will as to such property built for such purpose find that the same is not a part of the homestead of plaintiff," etc. For two reasons, viz., first, by this charge the right of defendants to subject any of said property to sale under their execution levy was made to depend on the sole fact that plaintiff had built a house thereon for the exclusive purpose of renting the same permanently; second, by this charge the right of defendants to have any part of the property sold under their execution was made to depend upon the fact that plaintiff had separated such property from the remainder thereof by building a fence around the house on such property; whereas the law is that if the plaintiff had fixed his homestead upon a certain part of the property and separated it from the remainder, and had permanently rented out such remainder to tenants, then such permanent renting divested such remainder of its homestead character regardless of the original purpose or intent with which plaintiff put the buildings thereon, and regardless of whether plaintiff built a fence around such building thereon or not. Wynne v. Hudson, 66 Texas, 1; Gregg v. Bostwick, 91 Am. Dec., 637 (33 Cal., 220); Kurz v. Brusch, 13 Iowa, 371; Casselman v. Packard, 82 Am. Dec., 710 (16 Wis., 114).

*Smith & Davis*, for appellee.—The verdict of the jury was right and the judgment of the court in all things was and is correct for the following reasons:

1. The evidence shows that the property described and in controversy was and is a part of the homestead of appellee.

2.   The property in controversy was the homestead of appellee before the same was levied on by appellants, and had been used by appellee as his homestead since July, 1867, and had never been abandoned by him, and was still used as such.   Newton v. Calhoun and Wife, 68 Texas, 451–6; Arto v. Maydole, 54 Texas, 246, 247.

GAINES, ASSOCIATE JUSTICE.—Appellee brought this action to enjoin a sale under execution of a certain parcel of land in the city of Cleburne, which he claimed as a homestead.   He was the head of a family and had his residence upon the western portion of the property described in his petition.   Upon its middle and eastern parts there were two small residence houses, with some of the usual appurtenances, which were occupied by his tenants.

The defendants below declared in their answer that the western portion of the property, being that upon which the plaintiff actually resided with his family, was embraced in their levy by mistake, and disclaimed all right to subject that to the payment of their judgment.   They however alleged that the other parts of the land were not a part of the homestead, and were subject to sale under execution.

There was a general verdict for the plaintiff and a judgment perpetuating the injunction as to whole property, and it is assigned that the court erred in not granting the motion for a new trial upon the ground that the verdict was contrary to the law and the evidence.

From the plaintiff's own testimony it appears that he bought the whole block in 1867 and enclosed it and built a residence upon it near the middle.   He subsequently sold a lot off the east end and another off the west end, leaving the parcel in controversy, which extends about 210 feet north and south and about 205 feet east and west.   He resided in the house near the centre of this parcel until 1878, when he built a new residence on the west portion, into which he then moved and where he has ever since resided with his family.   For some time he rented the old house as a boarding house, and he and his family took their meals with the tenants.   This house has been occupied by tenants ever since and was so occupied at the beginning of this suit.   In 1879 he built another residence on the east part of the property, which he testified he built for the purpose of leasing it to tenants for the income to be derived therefrom.   This house with its appurtenances had been leased ever since its construction and was occupied by a tenant when this suit was brought.

The following is from a sketch made by appellee and offered in evidence, and shows the situation of the property at the time of the trial:

The property had never been subdivided by any survey, but fences had been erected, partly by the owner and partly by a tenant, between the parcels upon which the residences are respectively situated. The dwelling houses all fronted south on Willingham Street. In leasing the property the appellee reserved no rights in the rented premises; but the only cistern upon either parcel is on the line of the fence between the middle and west lot, and up to the time of the trial the appellee had used the cistern for the purpose of supplying drinking water for his family, except upon a few occasions when the water was exhausted. This cistern was constructed originally as an appurtenance to the first dwelling house.

The case presented is strikingly similar to that of Newton v. Calhoun, in 68 Texas, 451. That case was tried below by the judge without a jury, and the court found in favor of the claim of homestead. In the opinion it is said: "Lots five, six, and seven were for a long time evidently the homestead of the family; and before either of them, while they continue under one common ownership, will cease to be a part of it, it must be applied to a use inconsistent with the uses for which the homestead is protected—to uses which clearly show an intention no longer to use it for purposes of a home. The court below was justified in holding that no such use was made of the lot; that there was no intention to abandon it as a part of the home and to rent it permanently; that it was in fact and in law a part of the homestead of the family. There was evidence, slight though it may have been, from which the court was authorized to find that while the houses on the lot were rented to others, the lot was more or less used all the time by the appellees and their family for home purposes."

The language quoted is strictly applicable to the middle lot in controversy. The appellee after moving into his new dwelling and after renting the old continued to use the cistern attached to the middle lot for the purposes of his family. We attach but little importance to the fact that the right to make use of the cistern was not reserved in the lease. The right appears to have been impliedly conceded, and under the circumstances it is to be presumed that if it should have been denied by any tenant at any time it would have been reserved in all future leases. The fact remains that although appellee by renting the lot may have parted with his strict legal right to use the cistern, he did continue to use it as an appurtenance to the dwelling house of himself and his family. This shows that he never intended wholly to abandon the use of it for domestic purposes. His way to the cistern was over the middle lot.

But from the opinion in the case cited the principle is deducible that when the owner of a parcel of land in a town or city occupied by him as the homestead of his family permanently devotes a part thereof to a purpose inconsistent with its use as a part of his homestead, and permanently abandons such use, the parcel so set apart ceases to be a part of the home-

stead. In this case the testimony of the appellee himself shows that he had built upon the east lot for the purpose of renting it as a place of residence and of thereby increasing his income. While there was no express division of the property into separate lots, the division fences erected by appellee himself, and by his tenant with his consent, are sufficient to mark the extent of the dominion of the tenants of the respective parcels and to show the boundary of the east lot. Appellee's testimony further shows that after the improvement and lease of the east lot he ceased to use it directly for any purpose whatever, and fails to show that he had an intention at any future time to devote any part of it to the domestic uses of himself and family. This evinces a permanent abandonment of the use of the lot under consideration for homestead purposes. If the head of a family by abandoning his residence upon a homestead once acquired, with the intention of never resuming it, may subject it to forced sale, although he may not have acquired another homestead, we think for a stronger reason it should be held that a part so abandoned ceases to be exempt from execution, although it may be contiguous to the remaining homestead of which it originally formed a part.

We conclude that as to the east lot, as practically defined by its enclosures, the verdict of the jury is not sustained by the evidence, and that for this reason the court should have granted the motion for a new trial.

What we have already said we think sufficient to indicate a proper charge upon another trial of the case, and we therefore deem it unnecessary to consider the assignment based upon the supposed error in the instruction of the court.

For the error pointed out the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Delivered May 28, 1889.

Associate Justice Henry did not sit in this case.