## DUNN v. ECKHARDT.

## In re C. ECKHARDT & SONS et al.

### (Circuit Court of Appeals, Fifth Circuit. February 27, 1919.)

### No. 3080.

1. COURTS ⟨⟩366(19) — FOLLOWING STATE DECISIONS — ABANDONMENT OF HOMESTEAD.

Whether bankrupt prior to bankruptcy abandoned any part of his Texas homestead is to be determined solely by the law as decided by Texas courts.

2. HOMESTEAD ⟨⟩181(1)—ABANDONMENT—BURDEN OF PROOF.

Under Texas decisions, the burden of showing abandonment of a homestead once existing rests on those contesting its continuance.

3. HOMESTEAD ⟨⟩162(1)—ABANDONMENT—REMOVAL—INTENT.

Under Texas decisions, removal from homestead, to constitute abandonment of it, must be shown to have been coupled with an intention never to return.

4. HOMESTEAD ⟨⟩165—ABANDONMENT—USE FOR OTHER PURPOSES.

Under Texas decisions, for use of homestead for other than homestead purposes to constitute abandonment, the use must clearly show an intention no longer to use it for purposes of a homestead.

5. HOMESTEAD ⟨⟩165—ABANDONMENT—NATURE OF USE.

Under Texas decisions, where one erected on part of his homestead lot a building, and, from its completion, used at least part of the second story as a bedroom for members of the family or guests, there was no abandonment of such portion as part of the residence homestead.

6. HOMESTEAD ⟨⟩165—ABANDONMENT—ERECTION OF BUILDING FOR OTHER PURPOSES.

Under Texas decisions, erection of a building on part of the homestead lot, with intention of using it for a purpose other than a homestead, does not divest such part of the lot of its homestead character; but there must be an actual inconsistent use.

7. HOMESTEAD ⟨⟩168—ABANDONMENT—TEMPORARY RENTING.

By express provision of Const. Tex. art. 16, § 51, no temporary renting of the homestead constitutes an abandonment.

8. HOMESTEAD ⟨⟩165—ABANDONMENT—USE OF PART OF BUILDING FOR INCONSISTENT PURPOSE.

Under Texas decisions, use of part of a building on the homestead lot for purposes inconsistent with the homestead, the balance being used for homestead purposes, does not divest it of the homestead character; it being an inseparable part of the building.

Petition to Superintend and Revise from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

In the matter of C. Eckhardt & Sons and William Eckhardt, bankrupts. Petition by W. H. Dunn, trustee of bankrupts, to superintend and revise a decree sustaining homestead exemption of William Eckhardt. Affirmed.

H. W. Wallace, of Cuero, Tex. (C. F. Carsner, of Victoria, Tex., and R. J. Waldeck, of Cuero, Tex., on the brief), for petitioner.

John H. Bailey, of Cuero, Tex. (A. B. Davidson, N. M. Crain, and A. C. Hartman, all of Cuero, Tex., and J. T. Linebaugh, of Victoria, Tex., on the brief), for respondent.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

BATTS, Circuit Judge. William Eckhardt, adjudged a bankrupt, claimed as exempt the property in controversy as part of his homestead. The trustee scheduled the property as part of the estate to be administered. An order of the referee, substantially confirming the action of the trustee, was reviewed by the District Judge. The bankrupt's exemptions were sustained, and the property decreed to be the business homestead of the bankrupt. The trustee has filed with this court a petition for review.

In 1866, William Eckhardt and family established their residence and business homestead on the west half of block 58 of the town of Yorktown, Tex. A storehouse was erected on the northwest corner, and the balance of the half block was used in connection with the residence. In the store building a grocery business was started, which was extended to other lines of merchandise and cotton buying, and in 1868 a private bank was added to the business. Adjoining the store building on the east a warehouse was erected, which was thereafter continuously used in connection with the business. About 1902 a two-story brick building, called the "bank building," was constructed; the foundation of the east wall of the warehouse being used as a part of its west wall.

[1] It is admitted that all of block 58 was exempt as homestead prior to the construction of the bank building. The question for determination is whether any part of this homestead had been abandoned prior to the bankruptcy. The question is to be determined solely by a consideration of the Texas decisions. No general principles of jurisprudence are applicable. The efforts of this court will be directed to an ascertainment of the law as developed by the courts of Texas.

[2-4] The rules for the determination of abandonment of a homestead are announced in a long and consistent line of decisions. The radical character of these rules is indicated by the following excerpts:

Robinson v. McGuire (Tex. Civ. App.) 203 S. W. 416:

"When it is shown that the homestead once existed, the burden of proof rests upon those who contest its continuance to show that it had been abandoned, and that, in order to constitute an abandonment, it is not sufficient to show a mere discontinuance of the use of the property as a residence, but it must also be shown that such discontinuance was accompanied by an intention never to resume its use as a homestead."

Armstrong v. Nevill (Tex. Civ. App.) 117 S. W. 1012:

"To constitute an 'abandonment' of the homestead, it must affirmatively appear that there was not only a removal from the home, but a removal coupled with an intention never to return."

In Rollins v. O'Farrell, 77 Tex. 91, 13 S. W. 1021, the court held not erroneous the following language of the charge:

"And if from all the testimony it clearly appears that the same was permanently abandoned," etc.

The court quoted from Newton v. Calhoun, 68 Tex. 451, 4 S. W. 645:

"Before either of them will cease to be a part of it * * * it must be applied to uses inconsistent with the uses for which the homestead is protected—to uses which clearly show an intention no longer to use it for purposes of a home."

This language is quoted approvingly by Justice Gaines in Langston v. Maxey, 74 Tex. 161, 12 S. W. 27. Chief Justice Hemphill used stronger language in Gouhenant v. Cockrell, 20 Tex. 98:

"Admitting, however, * * * that where there is an abandonment with a fixed intention not to return, the property may be open to creditors; yet it must be undeniably clear and beyond almost the shadow at least of all reasonable ground of dispute that there has been a total abandonment, with an intention not to return and claim the exemption."

Sykes v. Speer (Tex. Civ. App.) 112 S. W. 426:

"Abandonment is accomplished, not merely by going away without any intention of returning at any particular time in the future, but by going away with the definite intention never to return."

See, also, Drought v. Stallworth, 45 Tex. Civ. App. 159, 100 S. W. 189; Bogart v. Bank (Tex. Civ. App.) 182 S. W. 681; Woeltz v. Woeltz (Tex. Civ. App.) 57 S. W. 906.

[5, 6] *Was the Property Abandoned as a Residence Homestead?—*The following facts appear from the uncontradicted evidence:

At the time the construction of the bank building was determined upon, all of the west half of block 58 was in use as a residence and business homestead of the bankrupt and his family. Upon the half block were the residence, barns, a garden, the storehouse on the northwest corner and warehouses adjoining, all within the same inclosure, and a few steps only between them. The family consisted of the bankrupt, his wife, a daughter, and several sons. The latter had slept in a small house which the grandmother occupied. As they grew up, the available space became inadequate, and it was determined to construct a new building, a part of which should be used by them. The new building was constructed adjoining the old warehouse, on land that had been used by the children as a playground. It was only a few yards from the residence, and the steps into the upper story were on the outside in the home yard. When the building was completed, all of the upper story was furnished as a bedroom. The mother and daughter of the family testified that they considered it as a part of their home, and that it was kept in order as the balance of their residence; the rooms being given daily attention, just as the other rooms of the home, either by the mother or daughter, or by the hired help. The room was occupied by the boys until they became grown and were married, and one of them used it for a short time after his marriage. During this period they were regarded members of the family, and had their meals in the old residence. When the boys left, the room was maintained as before, being kept in order at all times. It was used by the boys when they visited the family, and by other guests, and sometimes by the mother and daughter when they desired to be by themselves, or when there was a family consultation.

Some years after the construction of the building, the upper story was partitioned, and the front part rented from month to month to

a dentist. The rear, used as before, containing bedsteads, wardrobes, tables, chairs, and other furniture which had been and continued to be used by the family. The building was considered as a part of the home. The ladies of the family covered its walls with ivy, and vines, flowers, and other shrubbery were placed along the rear and side. The rear room has never been used for any purpose other than those indicated, except that some sewing machines and shoes belonging to the business were stored there for a short time.

There can be no question that, after the construction of the "bank building," the second story was, for a while, used as a part of the residence homestead. Even if it be determined that the balance of the building was used for purposes inconsistent with the residence homestead, this part of the building was, as soon as the builling was completed, for a time used for purposes of the residence homestead, and the rear part of the second story was never at any time otherwise used. The lot upon which this building was constructed had been a part of the residence homestead. In order to divest it of its residence homestead character, there must have been a use definitely in conflict with the use of the property as a residence homestead, and a definite intention not to again use it for residence homestead purposes.

Whatever may be said with regard to the balance of the building, it is, of course, clear that the part which, after construction, was at once used for residence homestead purposes, could not be said to be used for a purpose in conflict with such use. The construction of a building, with the intention of using it for a purpose other than a homestead, does not divest the lot upon which it is placed of a homestead character that has been fixed. There must be an actual inconsistent use. Woeltz v. Woeltz (Tex. Civ. App.) 57 S. W. 906. Even if it were possible to abandon by mere intention, in the absence of inconsistent use, the upper story could not be held abandoned, for the testimony of the wife and daughter of the bankrupt clearly indicates that this story was constructed for homestead uses. Their statement of intention is admissible as evidence thereof (Thigpen v. Russell, 55 Tex. Civ. App. 211, 118 S. W. 1081), and their testimony is confirmed by subsequent use. As soon as the building was completed, this story was used for purposes, not only not inconsistent with the homestead use, but definitely a use to which a residence homestead would be placed.

The suggestion has never been made that the use of a room that was part of the residence homestead for the temporary accommodation of guests, or its use for a time by the recently married members of the family, affected in any way its residence homestead character. These are proper uses of a home.

The liberality of the law with reference to what constitutes a homestead is indicated by Anderson v. Sessions, 93 Tex. 279, 51 S. W. 874, 55 S. W. 1133, 77 Am. St. Rep. 873, in which the authorities are reviewed, and it is held that the use of detached lots for a garden would make them a part of the residence homestead. The court quotes from Arto v. Maydole, 54 Tex. 247:

"The question is not whether any portion of this adjoining block may have been a necessity or a mere convenience to the enjoyment of the homestead, but whether, in fact, it was a part of the homestead. If it was, the fact that it may have been used as an approach to the mansion, or for purposes of ornamentation of pleasure grounds only, would not defeat it of the homestead protection"

—and says:

"If playgrounds and shady parks, with graveled walks used only for pleasure or ornamentation, are protected, because used for the purposes of a home, we think that a little garden spot, although in a distant suburb of the town, would not be an improper or an unreasonable addition to the homestead, where it is used for the purpose of supplying the home table with the necessaries and comforts of life."

Even if some of the uses to which this part of the homestead had been put were not homestead uses, such uses would not constitute abandonment of the part so used, in the absence of an intention not to use them again for homestead purposes.

The status of the law is definitely determined by a large number of cases, a few of which are reviewed.

Whitley v. Alexander (Tex. Civ. App.) 198 S. W. 173:

A small house, which had been used as the family residence, was removed to a part of the lot segregated by a fence, and rented whenever any one could be found to rent it. The test was:

"Was there such a segregation of this portion of the homestead, coupled with the intention to abandon it as a part thereof, as to constitute abandonment?

Held not abandoned.

Drought v. Stallworth, 45 Tex. Civ. App. 159, 100 S. W. 189:

Two houses were erected on a lot of the block upon which the homestead had been located. The owner testified that he built the houses to rent, but that he had never surrendered their full control to any one, and that he had never abandoned the idea of using any part of this lot upon which the rent houses were situated as a home, and that he refused to sell the lot, because the sale and separation from his other lot would ruin his place as a home. During a portion of the time the houses were occupied by families who did the family washing and other services, presumably in payment for their use. The court sustained the claim of homestead.

Rollins v. O'Farrel, 77 Tex. 91, 13 S. W. 1021:

O'Farrel owned as a homestead 100 feet on a street, running back 315 feet to another. The residence was on the east end of the lot; and, at the time of the dedication as a homestead, there were on the west end a barn, bathhouse, and a cistern house, all inclosed in one fence, and used in connection with the residence. Shortly after, he converted the barn into a residence and moved it so as to front on the street. He also moved the bathhouse and cistern house, attaching two rooms to them, so that they could be used as a dwelling. One fence inclosed all of the property; a high board fence separating the tenant houses from the residence proper. The houses were rented when tenants could be found. There was evidence that the barn and other houses changed into dwellings was with the intention to make them

more valuable, and to sell them, and have them moved off the place, if a purchaser could be found; also that they were offered for sale to be removed, and that the foundation was of a character so that they could be easily moved. The claim of homestead was sustained.

Harle v. Richards, 78 Tex. 82, 14 S. W. 257:

Harle built a house on the east half of the block, which he and his family occupied as a residence, and also carried on a hotel business therein. Soon after he built a storehouse on a lot in the same block, and opened a grocery business. The buildings were so occupied and used for several years, the residence being used as a hotel under the management of Mrs. Harle while her husband conducted the grocery business in the storehouse, when the family moved from the residence into the back end of the storehouse, and the residence was rented as a hotel. The grocery business was closed, and Mrs. Harle opened a millinery business in the storehouse. This was the status at the death of Harle. Thereafter the widow went to live with her son, closed out her millinery business, and rented the storehouse. The court holds that—

"At the time E. Harle occupied the residence or hotel property with his family as their home, and carried on a business in the storehouse, both pieces of property were homestead. * * * We think it would be unreasonable to hold that the facts of the removal of the family from the residence to the back end of the storehouse and the temporary renting of the residence for hotel purposes constituted an abandonment of the residence as a homestead. * * * The property having acquired the character of homestead property, * * * the burden is on him who seeks to subject it to the liabilities of property not homestead to show that it has been abandoned by those to whom it was protected as a homestead."

Storrie v. Woessner (Tex. Civ. App.) 47 S. W. 838:

The homestead consisted of a residence, a barn, and two small tenements erected while the owner occupied the property under lease before purchase. In one of these he had some goods at the time of the trial, and the other was rented. He testified that they were not intended as permanent improvements, and that he intended, as soon as he could, to remove them and extend his business over the site. It was held that the use to which these smaller houses were put did not evidence a dedication of portions of the lot to other than homestead purposes.

There would appear to be no question that the rear room of the second story was, at all times, used for a homestead purpose, and that there was, at least as to that part of the building, no abandonment.

*Was the Business Homestead Abandoned?*—The business, as developed, included a cotton buying and private banking business. When the "bank building" was erected these parts of the business were conducted on the lower floor. The bank was subsequently national-ized, but was under control of the bankrupt, and was conducted by him and his sons as before, and the cotton business was conducted as before. Further facts with reference to the use of the property as a business homestead are indicated by the following testimony:

C. L. Eckhardt testified:

"I worked any and everywhere; later on in the cotton department. It required the keeping of books. Before the bank was built we kept them in the store, and after the bank was built we kept them in the back of the bank. It was the same way after the bank was converted into a national bank. The vault was still used for C. Eckhardt & Sons in the cotton business. The money and valuables of C. Eckhardt & Sons were kept in that bank. * * * That makes a common wall between the bank building and the warehouse. There are no openings in the wall. I think my father conducted a bank in that building 4 or 6 years before he nationalized. C. Eckhardt & Sons conducted a banking business since 1868; then they moved from the store to the bank building when it was built. When the bank was nationalized, my father rented the building to them; that is, only the lower floor. I had my cotton things in there just as before. I continued this until C. Eckhardt & Sons quit business. There was only a small office in the back of the big rock building. * * * Green and Welhausen got controlling interest in the bank about 5 years ago; then it was only a couple of years and they moved. * * * The national bank rented and paid rent for the whole lower floor, but I stayed in there until they moved out, just the same as I did before. * * * My desk was there until the bank moved out. I continued to do the cotton business there until we didn't handle any more cotton. * * * I think the building was leased to the bank always for a year, and went from year to year. * * * I think the bank moved out of the building about 12 or 15 months before my father quit business. There were some plows in the lower floor of that building, and some sewing machines and a whole lot of stuff that I helped put there myself. We used it as a storeroom after they moved out."

## Gus Eckhardt testified:

"My father conducted a banking business, and he conducted the cotton business in the lower floor. * * * Before and after the bank was nationalized we conducted the cotton business in the back part of the bank. That was the understanding; that is, from the vault back. * * * The general business of my father was kept open up to the time of the filing of the petition in bankruptcy. * * * After the bank moved, my father used the back part of the bank building for a storeroom and as his private office. Plows, fruit jars, sewing machines were stored there. * * * Since the building of the bank building there has not been a time when my father did not have charge of the back end of that building. * * * The private bank was conducted in that building up to 1902, if I remember right. Then it became a national bank. Then the national bank rented a part of the lower floor. The understanding was that my father was to use the back part of the bank building. * * * At the time (of the levy) there was merchandise stored in the back part of the bank building. I guess the clerks who worked for my father put them there. I put things in there myself. The shoes were upstairs when the levy was made."

## Testimony of Richard Eckhardt:

"After the new building was finished, we had a private bank and cotton office downstairs. * * * The warehouses in the back of the main building were in bad shape. It was not a fit place to store such things as sewing machines and soap and such stuff as was stored in the bank building. The value of the business done by C. Eckhardt & Sons during 1915, to the best of my judgment, was $40,000 or $50,000. * * * We exhibited some of the goods in the bank building for sale. We had ties, hats, shoes, shirts, etc. These were upstairs and in the back end of the lower floor."

## W. H. Dunn testified:

"I am the trustee in bankruptcy. * * * In taking the inventory I found some goods in the bank building, back of the vault."

256 F.—21

Dr. G. H. Hudson testified:

"I let the Eckhardts have some money, and agreed to let them pay it in rents. * * * That was about September 4, 1914. Since then I have been occupying the room and taking out tue money in rent. * * * When I first rented the building, I paid rent from month to month. I had no lease."

[7] *The Law as to Abandonment of Business Homesteads.*—The Texas constitutional provision defining and exempting the homestead (article 16, § 51), specifically provides that no temporary renting of the homestead shall constitute an abandonment. The liberal construction given to this provision, and the limited use which will affix or retain the business homestead character, are indicated by cases of which the following are typical:

Billings v. Matlage, 36 Tex. Civ. App. 619, 82 S. W. 805:

Matlage was head of a family, and had a residence home. He also owned the lot in question, upon which he had erected a one-story frame building, 30 feet by 60. He was in the mercantile business and used the building as a store, until, by reason of reverses, he was compelled to suspend, and turned the stock over to creditors. Shortly after he began, in the same building, the business of a retail grocer and commission merchant, and continued until stress of circumstances again forced him to suspend. He then executed a written lease, whereby the building was let for one year, the lessees to use it in conducting a banking business. Under the lease the shelving was to be stored in the rear part of the building, and the lessees were, upon the expiration of the lease, to restore it to its former position. By oral agreement, Matlage reserved, in the rear of the building, space for his safe and books, and thereafter occupied it in an effort to conduct a business of real estate, loans, and collections. At the expiration of the lease, he leased to the banking firm the western half of the building, reserving the eastern half, in which he continued his collection, real estate, etc., business, reserving the right to terminate the lease upon 60 days' notice. He intended to resume his mercantile business when conditions again became normal. On several occasions, when business was very dull, he left his place and engaged in manual labor for his livelihood. The court said:

"We are of the opinion the facts show the rentals were only temporary, and failed to establish abandonment."

The appellant complains of the failure of the court to submit the issue of the abandonment of the western half of the building. The court says:

"The building was an entirety, and homestead occupancy sufficient to exempt any part of it exempted the whole. The case is distinguishable from such as Hargadine's Case, in 71 Tex. 482, 9 S. W. 475, in which the owner of a homestead build a business building on a lot which was a part of his homestead, and which adjoined the building occupied by himself. The new building was constructed for renting purposes, and it was properly held to have the effect to sever from the exemption the lot upon which it rested. The case of Hinze v. Moody [13 Tex. Civ. App. 193] 35 S. W. 832, is in point."

Hinzie v. Moody, 13 Tex. Civ. App. 193, 35 S. W. 833:

The appellant was engaged in business as a grocer in a brick store-house, situated on a lot separated from his residence. He failed, and conveyed his property to a trustee for creditors. Before the failure the upper and lower floors were connected by an elevator, and both were used for carrying on his business. After his failure, he commenced business as a commission merchant, etc., and he kept his office on the first floor, which was also for a while occupied by his trustee in selling out the goods. Soon after the failure in 1889, he closed the elevator, and cut up the second story into rooms for bedrooms and offices, which he rented out. In January, 1892, a temporary partition was run across the lower floor, 60 feet back from the front, and the room was rented out for a saloon. Later, another concern occupied the entire lower floor, except 12 by 15 feet, holding under a lease for three years. They took out the partition, making the whole lower story one room. Appellant reserved and kept as his office 12 by 15 feet of the northeast corner. It was separated by a railing 3 feet high, upon which was a wire netting, 18 inches high. He kept his safe, desk, books, etc., in this office, and it was necessary to his business. There were no windows nor doors in the wall included in the office, and his only access was through the room occupied by his tenant.

"It is also contended," says the court, "that the extent of appellant's claim would be only so much of the lot and the building above it as would be marked off by the interior lines of the railings, and the lines of the lot on the outside. But the facts do not show such a separation and abandonment of the remainder of the building as to indicate certainly what portion of it had been abandoned. Appellant had the right of ingress and egress to and from the space marked for his office, through any of the doors, and over any part of the room, for himself and his customers. It will not do to say that he could cut into the walls a window on the alley, or a door to the street, for the answer would be that he has not done so. He has an open office in the rented building, with egress from and access to it for himself and all such persons as may have business with him."

In the instant case the renting was of no more permanent character than in the cases reviewed, and the retained use was quite as important.

[8] *Effect of Inconsistent Use of Part of Building.*—The effect of use of part of a building for purposes inconsistent with the homestead, when the balance is used for homestead purposes, has been indicated by the foregoing cases of Billings v. Matlage, 36 Tex. Civ. App. 619, 82 S. W. 805, and Hinzie v. Moody, 13 Tex. Civ. App. 193, 35 S. W. 832. The leading case is Forsgard v. Ford, 87 Tex. 185, 27 S. W. 57, 25 L. R. A. 155. The Supreme Court details the finding of the Court of Civil Appeals as follows:

"The facts as found * * * with reference to the half of lot 4 are * * * that the lot 4 fronted on Bridge street 25 feet, with a two-story house upon it, covering the entire front and running back 85 feet. Under the entire house * * * was a cellar. The first floor above the cellar was divided into three rooms, by running a partition across the house 25 feet from the front, and another partition dividing the front into two rooms fronting on the street. The Court of Civil Appeals finds that the entire lot under the house is exempted as homestead by reason of its use; that the rear room on the first floor and the second story are likewise exempted, but that the two front rooms on the first floor are not exempted—they having been abandoned

as a homestead and rented out for other uses. The question presented is: Can a part of a house, standing on a lot that is homestead, be subjected to forced sale under our Constitution and laws? The house upon lot 5 was a fixture within the meaning of the law, and as such was a part of the land itself. A sale of the land would carry the house and every part of it. * * * The house being attached to and a part of the realty, could not be seized and sold separately from the land. * * * The Constitution * * * (article 16, § 51) defines an urban homestead in this language: 'The homestead in a city, town, or village, shall consist of lot or lots not to exceed in value $5,000 at the time of their designation as a homestead, without reference to the value of any improvements thereon: Provided that the same shall be used for the purposes of a home, or as a place of business to exercise the calling or business of the head of the family: Provided, also, that any temporary renting of the homestead shall not change the character of the same when no other homestead has been acquired.' By this provision of the Constitution exemption is placed upon the lots and not upon the improvements. This was emphasized by the further provision that the value of the improvements shall not be included in determining the right. The use of the lot or lots impresses upon the land the homestead character. Whatever is so attached to the land as to become a part of it must partake of the character of the land; and if the land is subject to sale, the improvements upon it will be subject. If, however, the land cannot be sold, neither can the structures built upon it as permanent buildings, adapted to its use and intended by the owner for such purposes. It would not be contended, if this lot were not exempt from forced sale, that the sheriff could seize and sell the two rooms under these executions, nor would it be asserted that a sale of the lot would not carry the whole house. If the house, as a whole, be a part of the realty, as it evidently is, how can it be said that a portion of the house is not a part of the land; and if it be a part of the lot, under what rule of procedure can it be separated from the lot for the purposes of seizure and sale under execution?"

Bente v. Sullivan, 52 Tex. Civ. App. 454, 115 S. W. 350:

It was claimed that a part of the hotel building, 20 by 30 feet, had been abandoned as a part of the business or residence homestead. The court held that this portion of the building could not be separated or partitioned or divided from the main building, it being a part of the same structure.

The conclusions reached are:

1. The property was homestead before the construction of the bank building.

2. The construction of the bank building was not, in itself, an abandonment of the homestead.

3. The upper rear room was never used for a purpose inconsistent with the residence homestead use.

4. The first use of the lower floor of the bank building was for the conduct of a part of the established business, and constituted, with the adjoining houses, the place of the business.

5. The rentings of the lower floor are not to be differentiated in principle from those considered in the cases reviewed, in which the homestead claim was sustained.

6. The owner at all times conducted a part of his business on the lower floor; the use being of a character which, in the cases reviewed, was held to preserve the homestead character.

7. The renting of the upper front room was from month to month, and cannot, under the decisions, be held to have divested the homestead character.

8. If the renting of the upper front room had been of a character which would, if it had been of an entire house, have divested the homestead character, that effect will not follow; it being an inseparable part of the house.

Under the Texas decisions, the property in controversy was properly held exempt as part of the homestead of the bankrupt.

The judgment is affirmed.