No. 5753.

## A. H. NEWTON v. W. W. CALHOUN AND WIFE.

1. HOMESTEAD.—When contiguous lots of ground in a city are used for homestead purposes by a family whose home residence is located on one of them, a temporary renting of the other lot on which also there is a dwelling house will not divest it of the protection of the homestead exemption from forced sale, even though an intention existed in the mind of the owners to sell it, provided it was also the intention of the owners to continue the use of it for homstead purposes, if they could not sell it at a proper price.

APPEAL from Travis. Tried below before the Hon. A. S. Walker.

In May, 1885, one Emanuel recovered judgment against W. W. Calhoun and wife for a debt on account of groceries sold to them, and took judgment by default for thirty dollars and sixty-five cents. Execution was issued and levied on lot number five, block number one hundred and sixty-six, in the city of Austin, which was sold under execution on the fourth day of August, 1885, to Newton, appellant, for thirty dollars. Newton took a deed from the sheriff, and brought this suit against Calhoun and wife and others in trespass to try title. Defendants set up the claim that it was a part of their homestead, and Mrs. Calhoun claimed that it was her separate property, and not subject to sale to satisfy Emanuel's claim. The other defendants disclaimed. Judgment was rendered in favor of the disclaimers for their costs. The court found that the lot was part of Calhoun's homestead and not subject to sale, and rendered judgment in favor of defendant, but made a finding on the question of Mrs. Calhoun's separate rights, against her, in effect, that the sheriff's deed gave Newton title if the property was not homestead.

There was evidence that Mrs. Calhoun bought lots five, six and seven in 1872, for five hundred dollars, of her separate money. They lived on lot five until about two years before the trial, when the appellees built a house on lot seven and they moved into that. They claimed all three of the lots as their homestead. The lots were worth as much at the trial as they were ever worth, and were then valued at five hundred dollars for lot five, and four hundred dollars each for the other two, without the improvements. The appellees had lived on lot five the greater part of the time since 1874. They had no other homestead nor had they ever claimed one other than these three lots which are contiguous. Calhoun had a family of five children. They first lived on lot seven, then on lot five, and afterwards on lot seven again.

Mrs. Calhoun testified: "I live at present on lot seven; I own all three of the lots and claim them all as my homestead. I have no other homestead; own no other real estate except these three lots. I use these three lots every day. The fence does not run all the way back between lots five and six. We turn the cow, calf and horse in there to eat. We rent out lot five, but go back and forth. We use the well water from the well on the line between lots five and six."

The testimony tends to show that the Calhouns rented the houses on lots five and six for the means of support. Lot seven is fenced off from lot six, but there is an open gateway without a gate between the two. A witness testified that the fence between the houses on lots five and six was all on lot six. The fence between lots five and six does not run all the way back. There are no improvements on lot five except the two dwellings and a chicken house. There is no cistern on lot five. The tenants on lots five and six obtained water for cooking from the well and partly from the cistern on lot seven.

Calhoun testified: "There is only a part of a fence between lots five and six. We put that there when we lived on lot five. The fence does not run clear through—but only part of the way. That fence is on the bank of the ravine. We did not go by the line; we just put a little fence there to keep the neighbors apart. There are two openings in it near the well and another place open. We never have abandoned any of it as a homestead."

There was other evidence, and some of it conflicting, not deemed important to notice.

The following plot shows the location of the lots claimed as a homestead:

Statement of the case.

*EAST WALNUT STREET.*

Lot No. 7.     Lot No. 6.          Lot No. 5.

Cistern O

Gate

Tenant house

Fence.

Tenant house.

Ravine.

Dividing line of Lots Nos. 5 and 6.

Cow lot.

Well O

Tenant house.

*EAST AVENUE.*

Carriage
house

Stable

*ALLEY.*

N

W — E

S

*Osceola Archer,* for appellant, contended that the property was not a part of the homestead, and that title passed by the forced sale, citing Constitution of 1876, article 16, section 51; Axer and wife v. Bassett, 63 Texas, 548; Evans v. Womack, 48 Texas, 232; Medlenka v. Downing, 59 Texas, 38, 39; Peregoy v. Kottwitz, 54 Texas, 499, 501; Andrews v. Hagadon, 54 Texas, 575, 576, 577; Ruhl v. Kaufman & Runge, Texas Law Review, volume 5, No. 5, page 66, dated February 3, 1885; 6 Texas Law Review, 194; Stark v. Ingram, Texas Law Review, volume 5, No. 23, page 512, dated August 18, 1885; Wynne v. Hudson, 6 Texas Law Review, 199; Stringer v. Swenson, 63 Texas, 7; Effinger v. Oates, 61 Texas, 590.

*Sheeks & Sheeks,* for appellee, cited Constitution, article 16, section 51; Jacobs et al v. Hawkins, 63 Texas, 63; Axer v. Bassett, 63 Texas, 545; Foreman v. Moroney, 62 Texas, 723; Medlenka v. Downing, 59 Texas, 32.

Stayton, Associate Justice. That the property in controversy was the homestead of the appellees for many years prior to the time they improved the lot on which the house stands in which they actually resided at the time this case was tried, can not be denied, for with their family they actually lived in the house and used the lot and those contiguous to it for the purposes of a home.

It was a question of fact for the determination of the court below whether the use which the appellees had made of lot five since they have actually resided on lot seven, was such as to clearly indicate an intention no more to use lot five for the purpose of a home; and whether, in fact, lot five had not at all times been to some extent used for the purposes of a home. The simple fact that the houses on lot five had been rented was not sufficient to divest that lot of its homestead character. The necessities of the family may have been such as to induce its head, temporarily, to rent to others the houses on lot five without any intention permanently to use it only for the purpose of renting. Without disregarding the evidence in the case the court below may have come to the conclusion that this was true, and from his findings we infer did so.

The Constitution guards the homestead from loss by a mere temporary renting. If buildings not adapted to the purposes of a home had been erected on lot five, and such disposition

made of them and the lot as was inconsistent with a continued intention again to use the lot for the purposes of a home, a different case would be presented. Lots five, six and seven were for a long time evidently the homestead of the family, and before either of them, while they continue under one common ownership will cease to be a part of it, it must be applied to a use inconsistent with the uses for which the homestead is protected—to uses which clearly show an intention no longer to use it for the purposes of a home. The court below was justified in holding that no such use was made of the lot; that there was no intention to abandon it as a part of the home, and to rent it permanently; that it was, in fact and in law, a part of the homestead of the family.

There was evidence, slight though it may have been, from which the court was authorized to find that, while the houses on the lot were rented to others, the lot was more or less used all the time by the appellees and their family for home purposes.

That the appellees may at one time have thought of selling the lot would have but slight bearing on the question of abandonment. They might have desired to sell the three lots, but unless they did so, this desire could not affect the homestead right so long as they continued to use them for the purposes of a home; and if with a desire to sell it they temporarily rented it, intending to return to it if they could not make a sale to suit them, then the temporary renting would not affect their homestead right. It appears, however, from the evidence that the intention to sell lot five had been relinquished.

The court below, no doubt, gave to the evidence of a desire at one time to sell lot five, such weight as he thought it entitled to; and gave no weight in disposing of the case to the fact that the lot was the separate property of Mrs. Calhoun.

The sole ground on which there can be any pretense that the judgment is erroneous is that the evidence required a different finding by the court; but after a careful examination of all the evidence, we are not prepared to say that it so preponderated in favor of the proposition asserted by the appellant as to justify this court, on that ground, to set the finding aside, nor that it did not justify the finding made by the court below.

The judgment will therefore be affirmed.

*Affirmed.*