## A. T. HENSLEY & SON v. P. T. SHIELDS ET AL.

### No. 135.

1. **Homestead, Abandonment of.**—Before the levy of execution on three lots used so as to make them a homestead, a brick building was erected on the south half of one and temporarily leased, there being no evidence that the south half was fenced from the north half at time of levy. After sale thereunder defendants moved into the brick house from a house on north half of the lot. *Held*, there was no such abandonment of the south half as a homestead as to subject it to execution.

2. **Same.**—The subdivision of the lots by fence was not an abandonment of any part of them.

3. **Urban Homestead.**—The only limit upon an urban homestead is, that it shall not exceed the constitutional bounds as to value. Pryor v. Stone, 19 Texas, 320.

ERROR from Bexar. Tried below before Hon. W. W. KING.

*Upson & Bergstrom*, for plaintiffs in error.—To constitute property the homestead of the family, it must be for the use of the family for home purposes; and property used for the purpose of renting to tenants, or any other object inconsistent with homestead purposes, will not exempt it from forced sale. Ellis v. Singletary, 45 Texas, 40; Medlinka v. Downing, 59 Texas, 32; Ruhl v. Kaufman & Runge, 65 Texas, 723; Little v. Baker, 11 S. W. Rep., 549; Blum v. Rodgers, 15 S. W. Rep., 115.

*Houston Bros.* and *I. C. Baker*, for defendants in error.—1. The facts found do not constitute an abandonment of the homestead right in said property, or any part of it.

2. The whole of said three lots and the improvements thereon constituted the homestead of said defendant at the time of and before the judgment, execution, levy, and sale, and as such were exempt from forced sale.

FLY, ASSOCIATE JUSTICE.—Action of trespass to try title, claiming title through an execution under a judgment against P. T. Shields, brought by plaintiffs in error against defendants in error, P. T. Shields and his wife, C. M. Shields. Defendants claimed the land sold as their homestead, and set up homestead rights.

We find the following facts from the record:

1. On December 22, 1888, plaintiffs obtained a judgment against defendant P. T. Shields for the sum of $1262, and obtained an execution under the same on April 18, 1889, which was levied on lots 1, 2, and 3, in a subdivision of the east half of the north one-third of lot number 20, range 5, district 1, on the corner of Olive Street and a street not named, having a front of 50 varas on Olive Street and a depth of 45 varas, being the land in controversy; and the same was on the first Tuesday in June, 1889, sold by the sheriff of Bexar County to plaintiffs in error, he executing a deed to them for the same, which was duly recorded. The sale in all things complied with the requirements of law.

2. That lots 1 and 2 in controversy were bought by defendants in error in 1885, the sum paid and the value of the same being $450, and in 1888 lot number 3, also in controversy, was bought by defendants for the sum of $175, and a lumber house was built by them on the north half of lot number 1, and a vault, tool house, stable, and store room were at the same time built on the north half lot number 2. After the purchase of lot 3, all three lots were fenced in one enclosure. There were improvements on lots 1 and 2 above indicated made in 1885, and as soon as the residence was completed defendants in error, who were man and wife before and since that time, moved into the house and used it for homestead purposes until their removal from it in 1889; and when lot number 3 was bought it was attached to and became a part of the homestead, the value of the whole, with improvements, being about $1400.

3. The defendants, in the summer of 1888, began the erection of a brick residence on the south half lot number 1, and completed it on or about December 1, 1888, and on account of the wife's sickness it was then temporarily rented until July, 1889, when the tenants left and defendants in error moved in. After they moved into the brick house on the south half of lots 1 and 2 they rented temporarily the lumber house on the north half of 1 and 2, but used water from the cistern on those parts of the lots, as there was no cistern or well on the south half of the lots, and used the stable on north half of said lots for their horses and other animals, and the storehouse for tools used in the trade of the husband.

4. The south half of lots 1 and 2 had at the time of trial been fenced off separately from the balance of these two lots and from number 3, which last named lot is fenced separately from the other two, said lot number 3 being used for stacking hay and storing derricks and building material used by defendant P. T. Shields in his business as a contractor.

5.  That defendants in error moved into the brick house on the south half of lots 1 and 2 after the plaintiffs in error had purchased the lots at execution sale. · There was no evidence offered to show that there were any fences on said three lots prior to the time of levy, except the fence that enclosed all three lots in one enclosure.

6.  That the plat below indicates the position of the lots.  Upon the facts substantially as herein set out, the trial judge decided that all three of the lots were the homestead of the defendants in error, and rendered judgment for them for the property in controversy.

Street not named in deed

There is but one error assigned, which is copied in full, as follows: " The court erred in the fourth subdivision of its conclusions of fact, in finding that defendant's improvements used by him and his family for homestead purposes are situated indiscriminately upon all three of the lots in controversy, without reference to the lot lines, and that there was no part of the

three lots which can be segregated from the balance without destroying or depriving defendant of a part of his homestead improvements necessary for the use of himself and family, because the evidence shows, that at the time of the levy of the execution in this cause and sale thereunder, defendant occupied with his family the north half of lots 1 and 2, which said north half was separated from the south half by fences; that the same had a good, substantial house and appliances required for homestead purposes, and that no part of the south half of said lots were used and occupied by defendants for the purpose of a home, nor was lot 3 so used; or if said finding is correct, then the court erred in said conclusion of fact, in finding that the north half of lots 1 and 2 were and constituted a part of the homestead of defendants, because the said north and south portions being separated, and each separately enclosed by fences, and each having a dwelling house and all connections and attachments complete as homesteads, and both portions can not constitute the homestead of the defendants; and therefore if the dwelling constructed on the south half of lots 1 and 2, with the intention of making it a home for defendants, constituted the same defendants' homestead as against plaintiffs' execution, then the north half can not be a portion of the homestead, and the court erred in refusing to render a judgment for plaintiffs for either the north or south half of lots 1 and 2, with the improvement, and lot 3.

*Conclusions of Law.*—Before entering upon our opinion as to the law that we consider applicable to the conclusion of facts gleaned by us from the record, we will say, that the testimony does not show, directly or indirectly, "that at the time of the levy of the execution in this cause and sale thereunder," that the north half of lots 1 and 2 was separated from the south half by fences. There is some testimony that there were fences between the north and south half of the two lots mentioned, but as to the time of their erection the record is silent, and neither the court below nor this one is called upon to presume this fact, but upon the finding of such fact is predicated the whole of the assignment of error, and perforce the brief of appellant.

It is clear to the minds of this court that all three of the lots had been impressed with the homestead character before the judgment was obtained under which the execution was issued; and the issue presented by appellants' brief is whether the building of the brick house and its rental stripped it of its homestead character, and rendered it liable to execution. We can see no act upon the part of appellees evincing any intention or desire to abandon lot 3 as a part of their homestead. If it ever became a part of the homestead of appellees there has been no act upon which even to hinge an argument that indicates any desire to put that part of the land to any but homestead uses. We do not construe our decisions to hold that the mere separation of portions of a homestead by

fences is an act of abandonment in itself of homestead rights. Both of the appellees swear that they bought lot 3 to form a part of their homestead, and there is no act of theirs shown which is inconsistent with this declaration. It was, when bought, put into one general enclosure with the other two lots, and was impressed with the seal of the homestead exemption. The only use to which it was put, besides being a part of the yard about the house, the storage upon it of derricks and material used by the husband in his business as an architect, was clearly in consonance with the purpose to which it had been dedicated. No tenant was placed upon it, but it held the original character with which it had been clothed at the time of purchase. It remains in the same position that it would have held had there been no brick house erected. The only limit put upon an urban homestead is its value at the time of dedication, and we can see no reason for the assumption that a homestead can not be made to embrace a greater area in a city, as long as the value bounds indicated in the Constitution are not exceeded. The third lot was added without transgressing upon the value limits, and it became a part of the homestead, and there being no act since its acquisition inconsistent with the design of its purchase and dedication, it was not subject to execution. Pryor v. Stone, 19 Texas, 371; Axer v. Bassett, 63 Texas, 545.

In 1888 the erection of a brick house was begun by appellees on the south half of lot 1, and in December of the same year it was completed, and was then rented until July, 1889, when appellees removed from their house into the brick building. The acts of appellees before the levy of the execution must determine the question of whether there was an abandonment, except in so far as the subsequent acts reflect light on the acts beforehand, and serve to indicate the intention of the parties in the erection of the brick house and the renting of it after its completion. The writ of execution was levied on April 18, 1889, on all of the lots, and could only attach to that part of either of the lots that was subject to execution at that time.

In order to ascertain the part or parts of either of the lots that were subject to execution, it becomes necessary to examine into and scrutinize the testimony as to acts claimed to evidence abandonment of homestead rights which occurred prior to the levy, in the light of any acts of appellees after that time that may tend to explain their previous actions.

The removal into the brick house occurred after the levy, and if there was an abandonment of any part of the homestead it must have been as to the south half of lots 1 and 2, for up to the time of the levy there was nothing to show any intention to divert the old lumber house from its legitimate homestead purposes.

The testimony shows, that at the time of the trial, nearly two years after the levy of the execution, that the north half of lots 1 and 2 had been cut off by a fence from the south half of the same, and that there

was no means of communication from these lots to lot 3 except by a passage way from Olive Street along the south of the north line of lots 1 and 2, by the stable and the storeroom, to number 3. Only the brick house without the land seems to have been rented to the tenant at the time of the levy; and the testimony is to the effect that the lease was temporary, and was only made because the wife was too sick to be moved from the old house. This removal from the old house to the new does not indicate that there was to be any diversion of the old house to other than homestead purposes, and neither does a temporary lease of this old house evidence abandonment of any part of the lots as a homestead.

In the case of Blum v. Rogers, 78 Texas, 531, which is cited with confidence by appellants as decisive of this case, it is said, "We do not wish to be understood as holding that the mere renting of a part of the homestead will subject it to forced sale." That decision follows a long line of Texas decisions, which hold that when a city or town homestead is divided and improvements upon the subdivisions for the purpose of being leased, that an unimportant or subsidiary use of the subdivisions for household purposes will not protect the lots so improved from forced sale. As before stated, however, the lease of the old house can have but little influence on the decision of this case, and it becomes a question as to whether the circumstances surrounding the whole affair show an abandonment of the homestead in the south half of lots 1 and 2. We are of the opinion that the lease of the brick house, taken with all the other circumstances in proof, does not show an abandonment of any part of the lots. In speaking of a city homestead composed of several lots, Judge Stayton, in the case of Newton v. Calhoun, 68 Texas, 451, says: "It was a question for the determination of the court below, whether the use which appellees had made of lot 5 since they have actually resided on lot 7 was such as to clearly indicate an intention no more to use lot 5 for the purpose of a home, and whether, in fact, lot 5 had not at all times been to some extent used for the purposes of a home. The simple fact that the houses on lot 5 had been rented was not sufficient to divest that lot of its homestead character. The necessities of the family may have been such as to induce its head temporarily to rent to others the houses on lot 5, without any intention permanently to use it only for the purpose of renting. Without disregarding the evidence in the case, the court below may have come to the conclusion that this was true, and from his findings we infer so. The Constitution guards the homestead from loss by a mere temporary renting. If buildings not adapted to the purpose of a home had been erected on lot 5, and such disposition made of them and the lot as was inconsistent with a continued intention again to use the lot for the purpose of a home, a different case would be presented. Lots 5, 6, and 7 were for a long time evidently the homestead of the family, and before either of them, while they continue under one common ownership, will

cease to be a part of it, it must be applied to a use inconsistent with the uses for which the homestead is protected—to uses which clearly show an intention no longer to use it for the purposes of a home.   The court below was justified in holding that no such use was made of the lot; that there was no intention to abandon it as a part of the home, and to rent. it permanently; that it was, in fact and in law, a part of the homestead of the family.   There was evidence, slight though it may have been, from which the court was authorized to find, that while the houses on the lot were rented to others, the lot was more or less used all the time by the appellees and their family for home purposes.''

While we are aware that the decision of a court as to whether or not there has been an abandonment of the homestead, applying general principles of law, must be controlled by the facts of each particular case, yet we have quoted so extensively from the above cited case because the facts. in that case present a stronger case upon which to base a decision of abandonment than the one we are considering.   In the Newton-Calhoun case there. were three lots, as in this case, and there were three houses, and each separated from the other by a fence.   The Calhouns first lived in one and then another of these houses, and the evidence tended to show that the houses were rented as means of support, and the tenants on lots 5 and 6 obtained. water from a cistern and well on lot 7.   Mrs. Calhoun testified that they rented lot 5, but got water from the well on the line between lots 5 and 6. The Newton-Calhoun case is quoted approvingly in the case of Langston. v. Maxey, 74 Texas, 161, and also in the case of Rollins v. O'Farrell, 77 Texas, 91.   Neither is there anything in the case of Blum v. Rogers that. is in conflict with the decision in the case of Newton v. Calhoun.

In the case of Blum v. Rogers the latter owned two acres of ground in. a block.   On the eastern end was his dwelling, and the western end was. cut up into three lots, and upon each he erected a dwelling house, each with all the conveniences of a family residence, fencing each lot to itself,. and separating the whole western acre from the eastern by an alley twenty-two feet wide.   These houses had been rented for years, and were rarely without a tenant.   As the court says, '' it seems pretty clear that these lots. had ceased to be used for the purposes of a home.''   This whole decision is made to turn on the fact that these lots were wholly detached from the homestead, and were permanently used for the purpose of renting.

At the time of the levy of the execution in the case now before this. court, there was only a temporary leasing of a part of the homestead; the evidence fails to show that there were any inside fences separating the lots. one from the other, the only testimony on the subject being that the inside fences had been erected at the time of the trial, two years after the levy of the execution.   The temporary leasing of part of the homestead did not rob that portion of its homestead character.   All the testimony in

regard to the homestead was introduced by appellees, and when they showed that the homestead character had attached to their property, the burden then rested upon appellants to show that there had been an abandonment of the homestead. They have failed to do this. The abandonment was a question of fact submitted to the trial judge, and he, with all the facts and the witnesses before him, has pronounced in favor of the homestead character of the land. We are not prepared to say that his judgment is not supported by the facts, and might go even further, and say that the preponderance of the testimony is in favor of appellees.

There is no error in the judgment, and it is affirmed.

*Affirmed.*

Delivered January 8, 1894.