**RITZ et ux. v. FIRST NAT. BANK OF PECOS. (No. 1241.)**

(Court of Civil Appeals of Texas. El Paso. Oct. 27, 1921.)

1. Homestead ⟨⟩162(1)—Abandonment of homestead a matter of intention.

If one leaves his homestead with the intention of never returning thereto, or such intention is formed subsequent to removal, the property loses its homestead character and becomes subject to execution, but the contrary rule applies if the intention is to return, and a removal from the state and an attempt to sell the property is not inconsistent with an intention to return.

2. Homestead ⟨⟩181(1)—Burden of proving abandonment on party claiming it.

The burden of proving an intention to permanently abandon a homestead rests upon the one asserting it.

3. Homestead ⟨⟩181(3)—Proof of abandonment of homestead must be clear.

One asserting abandonment of a homestead must prove it beyond all reasonable ground of dispute, notwithstanding the general rule that the verdict of a jury upon conflicting evidence will not be disturbed.

4. Homestead ⟨⟩154—Abandonment by head of family binding upon wife.

It is the right of a husband, as the head of the family, in good faith to abandon his homestead, and such an election will be binding upon the wife.

5. Homestead ⟨⟩181(2)—Testimony of wife of intention to return admissible.

In an action wherein abandonment of homestead was involved, testimony of wife of debtor as to the temporary nature of the absence of her husband and herself and their joint intention to return was admissible.

6. Homestead ⟨⟩181(3)—Evidence insufficient to sustain finding of abandonment.

In an action wherein issue of abandonment of homestead was raised, evidence *held* not to warrant a finding of jury of abandonment.

7. Trial ⟨⟩228(1) — Instruction on general rules of law on homestead issue held not erroneous for omitting instruction on burden of proof.

In an action involving an attachment and abandonment of homestead, it was not necessary that an instruction on the burden of proof concerning abandonment be incorporated in a paragraph wherein court undertook to give the general rules of law upon the homestead issue.

8. Appeal and error ⟨⟩216(2)—Request for proper charge necessary as to matters of omission.

Omissions from instructions cannot be assigned as error in the absence of a request for a proper charge.

Appeal from District Court, Reeves County; Chas. Gibbs, Judge.

Suit by the First National Bank of Pecos against Max Ritz, wherein a writ of attachment was levied upon land, which defendant's wife, in a cross-action joined by her husband, claimed to be homestead. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Clem Calhoun, Jno. B. Howard, and W. A. Hudson, all of Pecos, for appellants.

Ben Palmer, of Pecos, for appellee.

HIGGINS, J. Appellee on September 3, 1921, brought this suit against Max Ritz to recover upon a promissory note in its favor executed by him.

Upon the filing of the petition the plaintiff applied for a writ of attachment upon the ground that Ritz was a nonresident. The writ was issued and levied upon certain premises in the town of Pecos.

Ritz answered, admitting that the bank

was entitled to judgment against him upon the note.

By cross-action Mrs. Ritz, joined by her husband, set up that the property levied upon under the writ was their homestead and had never been abandoned by them, that the writ had been wrongfully and maliciously issued, and sought to recover damages therefor. By supplemental petition the bank set up that Ritz and wife had moved to California and permanently abandoned as a home the premises levied upon.

Upon trial a verdict was returned in favor of the bank, and judgment rendered in its favor upon the note with foreclosure of the attachment lien and that Ritz and wife take nothing by cross-action.

From this judgment the latter appeal, and first assign as error that the evidence is insufficient to sustain the verdict and judgment against them upon the homestead issue.

[1] The evidence discloses that Ritz and wife had lived upon the premises with their two children. Ritz was involved financially and became ill. About June, 1920, he left Pecos and went first to Bisbee, Ariz., where he remained for some time with a sister. He then went to California, where he still remained at the date of trial on November 29, 1920. On August 25, 1920, Mrs. Ritz left Pecos and joined her husband in California. While there they have lived with her mother. Prior and at the time of her departure for California negotiations were pending for the sale of their home to a Mr. Merriman, but after her departure the trade fell through. Mrs. Ritz stayed in the home until she left for California. From what has been said it will be observed that the premises in Pecos had been impressed with the homestead character; that, while the Ritzes had removed from the same, a new homestead had not been acquired. The question is thus presented as to the intention of the Ritzes in leaving the same. If they left it with the intention of never returning thereto, or if such intention was formed subsequent to their removal, then the property lost its homestead character and became subject to execution. But, if such was not the intention, the contrary rule applies. Max Ritz did not testify, but Mrs. Ritz did. Her testimony in full is as follows:

"My name is Maude Ritz. I live at Pecos, Reeves county, Tex., and have lived here since I was married, 8½ years ago last June. I am Max Ritz's wife. Max is with my mother in Los Angeles, Cal., and is not here because he is sick and has gone to California trying to get well; he has been down with chills and fever; his health is broken down generally. I have forgotten the exact day he left here, but it was in June of this year. I left here in August some time. Yes; Max and I have a home here in Pecos; we call this home. Our home is located on lots 7, 8, and 9, of block 18, West Park addition to Pecos, Tex. We bought it from Mr. Wylie, who lives in Sweetwater, and we still owe $2,000 on it yet. No sir; we have never moved. My household goods are stored here now, but I had to sell some of my furniture to get money. I had to have some money to go to my husband in California and to take care of him with after I got there, and sold part of our furniture. He was sick at the time. Yes; we have two children; one is 5½ years and one 2½ years old. Yes; Max and I are still living together as husband and wife. We lived in our home here from the time we bought it, which was some time during the oil boom, I don't remember just what month, until August, when I left. We had no other home and never had one before that, nor since; that is all the home we ever had and all we have now. I went to California to take care of Max, my husband. I thought he needed me. My mother is there and has been there about a year, and I think she is permanently located there. I had made a trade to sell my home when I went to California. I was intending to put the money I received in on another home. I was making the trade with Mr. Merriman. He was to pay me $1,500. No, sir; I never received the $1,500. I thought the trade was already made, but I never received the $1,500. The First National Bank of Pecos ran an attachment on the home, and Mr. Merriman would not take it. He told me he wanted it. The consideration was this: There was $2,000 due on and against the place, and he was to take that up and pay me $1,500 above that. No, sir: I did not intend to stay in California. I don't know that I had any other place picked out, other than Pecos. We had a nice little home here, and we were in California only temporarily for my husband's health. Yes; you kept me informed of everything, and when the trade was up you advised me that there was something wrong about the title, and that it it had to be fixed to the satisfaction of Mr. Merriman, and I thought the trade was made, until you notified me by letter that the First National Bank was running an attachment on our home. Yes; I think I remember the day I left Pecos; I think it was July 25, 1920. I sold some of my furniture to get money to go there on. I think it took around $150 that was necessary to come here to attend court."

Cross-examination of Mrs. Ritz by plaintiff:

"I do not remember the exact day Max left, but it was two or three months before I did. No; he did not go immediately to California when he left; he went to his sister's in Bisbee, Ariz. He did not stop in El Paso that I know of; in fact, I don't think he did. He stayed in Bisbee from the time he left here until about a week before I left. I don't think it was three months he stayed there; I know it wasn't. He has done nothing at all since he left here; he has not been able to do anything. We are living with my mother. She doesn't exactly support us. We sold some of our furniture and have a little money, but it won't last long. I have cooking utensils, bedclothes, window shades, and dishes stored here in Pecos. Yes, sir; I contracted to sell Le Grand Merriman the place before I left. Yes, sir; Max owed him $200, and he was to take that $200 out of the $1,500 that would be due us on the home; that would leave $1,300. Yes, sir; Max had some

trouble with his father before he left. I don't exactly know how long after that before he left. I don't think he went down town after that. No; that was not the reason he left here; he left because of his health. He went to Toyah in a car, and from there on the train. He left between breakfast and dinner. Negro Jim, the porter at the barber shop, went with him and brought the car back home. I don't know why he didn't get on the train here at Pecos; he didn't say. My mother and two boys taking care of her and a sister and her husband live with my mother in Los Angeles. I was intending going there on a visit some two or three weeks before I went, some time the first of July. Max stopped in Bisbee to see his sister. Yes, sir; Bisbee is near the Mexican border. I don't know though just how near it is. I don't know whether he was in Mexico a part of the time or not. I left a deed to Le Grand Merriman with Mr. Howard when I left here. Max had signed the deed before I left. He signed it in Bisbee, Ariz., and sent it here, and I signed it and took it over to Mr. Howard. I don't remember ever making a statement in Mr. Drane's presence that I was almost crazy to get away from here. I don't remember making that statement at all. I may have expressed a desire to be with my husband. No, sir; I did not make that statement to Le Grand Merriman. He was up there some to see about buying our home, but I didn't make that statement. If I did make the statement that I was anxious to get away and go to Los Angeles, it was to get away to see my husband. I don't remember that I said that even. Yes; I have a letter in my possession written by Mr. Beauchamp of the First National Bank to Max (producing the letter). Yes, sir; Max received this letter through the mail. I don't remember when he received it. The date shows when it was written, and it takes about three days to go there, and I don't think it was delayed, but I haven't the envelope."

Redirect examination of Mrs. Ritz by defendant:

"I intended to go to see how Max was, and that is what I did, and I had no intention whatever of abandoning our homestead. Yes, sir; I was anxious to get away to see about my husband, and if I made any statement at all it was to the effect that I was anxious about Max. Yes, sir; before Max left here he turned over all of his property except the homestead to his creditors; our home is all the property we have."

Recross-examination of Mrs. Max Ritz by plaintiff.

"No; he didn't just leave his property, and his father just took charge of it under a mortgage. Max told me to turn it over. We talked about it before he went away. He said turn it over to Daddy Ritz, because he was on his note, and we thought he was the proper one to turn it over to. Yes; I know he has sold it."
"Yes; I stated that I left Pecos about the 21st of July, but since refreshing my memory I found that I left the 25th day of August, 1920."

Considering now the rules of law applicable to the facts presented, it is well settled that a temporary absence from the home does not constitute an abandonment. And it has frequently been held that temporarily removing to another state does not operate as an abandonment of a home in Texas. Graves v. Campbell, 74 Tex. 576, 12 S. W. 238; Lumpkin v. Nicholson, 10 Tex. Civ. App. 108, 30 S. W. 568; Aultman & Co. v. Allen, 12 Tex. Civ. App. 227, 33 S. W. 679; Farmer v. Hale, 14 Tex. Civ. App. 73, 37 S. W. 164; Gaar, Scott & Co. v. Burge, 49 Tex. Civ. App. 599, 110 S. W. 182; Robinson v. McGuire, 203 S. W. 415. Neither was the offer to sell necessarily inconsistent with an intention to return and reoccupy the property as a home if a sale was not made. Thomas v. Williams, 50 Tex. 269; Newton v. Calhoun, 68 Tex. 451, 4 S. W. 645; Thigpen v. Russell, 55 Tex. Civ. App. 211, 118 S. W. 1080; Gaar-Scott & Co. v. Burge, 49 Tex. Civ. App. 599, 110 S. W. 181; Dunlap v. English, 230 S. W. 829.

[2] The burden of proving an intention to permanently abandon a home rests upon the one asserting it. Graves v. Campbell, 74 Tex. 579, 12 S. W. 238; Harle v. Richards, 78 Tex. 80, 14 S. W. 257; Cooper v. Basham (Sup.) 19 S. W. 704.

[3] In support of the verdict and judgment appellee invokes the general rule that the verdict of the jury will not be disturbed where the evidence is conflicting. But upon the homestead issue and as to the character of proof necessary to show that property has lost its homestead character by abandonment before a new and permanent home has been acquired, our courts at an early date spoke in no uncertain terms. In the language of Judge Hemphill:

If "a homestead may be disrobed of its guaranties, and the protection lost" before "a new and permanent one has been acquired," "it must be undeniably clear and beyond almost the shadow, at least all reasonable ground of dispute, that there has been a total abandonment with an intention not to return and claim the exemption." Gouhenant v. Cockrell, 20 Tex. 96.

In Cross v. Everts, 28 Tex. 523, Justice Coke said:

"The rule to be extracted from the cases of Shepherd v. Cassidy, 20 Tex. 29, and Gouhenant v. Cockrell, 20 Tex. 96, where this question was discussed and decided by our predecessors in this court, and which is believed to be the correct one, is that, if it be admitted that an old homestead may, in opposition to this general rule laid down by Judge Story with regard to the change of domicile, be abandoned before the acquisition of a new one, it can only be on the most clear, conclusive, and undeniable evidence of abandonment of the homestead."

In Scott v. Dyer, 60 Tex. 135, it was said:

"An old homestead will not be considered abandoned before the acquisition of a new one, except upon clear and conclusive proof of an abandonment with an intention not to return."

In Rollins v. O'Farrel, 77 Tex. 90, 13 S. W. 1021, it was said:

"But we see that our Supreme Court requires certain and conclusive evidence of abandonment with no intention of returning to subject property once the homestead to execution."

Other decisions by our Supreme Court of like import might be cited, but it is useless to multiply the authorities. It is sufficient merely to add that in the very recent case of Hudgins v. Thompson, 109 Tex. 433, 211 S. W. 586, Justice Greenwood in passing upon the degree of proof required upon the issue of abandonment quoted with apparent approval the strong language used in Gouhenant v. Cockrell, above set forth. But in that case it was held that the facts conclusively showed an abandonment.

[4-6] It is true that in the case at bar the appellant, Max Ritz, did not testify and we recognize the rule that it was his right, as the head of the family, in good faith to abandon his Pecos home, and that such an election would be binding upon his wife. Hudgins v. Thompson, supra; Wynne v. Hudson, 66 Tex. 9, 17 S. W. 110. But Mrs. Ritz's testimony clearly discloses that their absence was temporary and rebuts the idea of a permanent abandonment by her husband. Her testimony as to the temporary nature of the absence and their joint intention to return was admissible. Gunn v. Wynne, 43 S. W. 290, in which a writ of error was refused by the Supreme Court. See also Morris v. Balkham, 75 Tex. 111, 12 S. W. 970, 16 Am. St. Rep. 874, where the testimony of the wife was admitted to show that she and her husband had abandoned the home with the intention of never returning. We think the evidence discloses some facts and circumstances tending to support the verdict and judgment, but, tested by the rules of law announced above, we are of the further opinion that it does not measure up to the standard required to show a permanent abandonment by the Ritzes. That a new permanent home had been acquired is not asserted by appellee. It is shown by Mrs. Ritz and by their physician that Max Ritz was in ill health, although the doctor said it was not necessary for him to go to California, and that he did not advise him to do so. Max Ritz had been away not not more than three months when the attachment was levied, and Mrs. Ritz only a few

days. She stored and left in Pecos cooking utensils, bedclothes, window shades, and dishes. The testimony of the wife explains the removal from the home and clearly rebuts the theory of permanent abandonment.

Since the case must be tried again, we will not comment further upon the probative force of the evidence and confine ourselves to the conclusion that the appellee has not discharged the burden which rests upon it, under the facts of this case, of showing an intention not to return, by evidence "most clear, conclusive, and undeniable." Cross v. Everts, supra.

In Thomas v. Williams, supra, the Supreme Court set aside a finding adverse to the homestead claim upon evidence which was apparently more cogent than here presented. See, also, Farmer v. Hale, 14 Tex. Civ. App. 73, 37 S. W. 164, and writ of error denied.

The first assignment questioning the sufficiency of the evidence to sustain the finding adverse to the homestead issue is sustained.

The remaining assignments complain of the third paragraph of the court's charge upon the ground that in such paragraph the jury should have been instructed that the burden rested upon the bank of proving the intention of Ritz to permanently abandon the home in Pecos.

[7, 8] In that paragraph the court undertook to give the general rules of law upon the homestead issue. It was not necessary that the instruction upon the burden of proof be incorporated in that particular paragraph. Furthermore, it related to a matter of omission, and it was incumbent upon the appellants to request a proper charge upon the burden of proof if they desired same given. In this connection we note that in the twelfth paragraph the court charged upon the burden of proof, and no error is assigned thereto.

In view of a retrial attention is called to the fact that the burden rested upon the bank of showing that the home in Pecos was permanently abandoned by Ritz. Graves v. Campbell, 74 Tex. 576, 12 S. W. 238; Harle v. Richards, 78 Tex. 80, 14 S. W. 257; Cooper v. Basham (Sup.) 19 S. W. 704; Welborne v. Downing, 73 Tex. 527, 11 S. W. 501.

The charge given upon the burden of proof does not clearly fix the same.

Reversed and remanded.