**HUGHES et al. v. BOND et ux.**

**No. 1799.**

Court of Civil Appeals of Texas. Eastland.

May 20, 1938.

Rehearing Denied June 17, 1938.

Critz & Woodward, of Coleman, for appellants.

Thos. E. Hayden, of Abilene, for appellees.

LESLIE, Chief Justice.

On May 20, 1938, this court delivered an opinion in this case, affirming the judgment of the trial court. The appellant has filed a motion for rehearing, presenting in substance the contentions of his original briefs and calling our attention to certain inaccuracies in the plat (incorporated in the opinion) of the town lots involved in this litigation. The lots are 75 feet in width and not 50 feet, as indicated by the plat in the original opinion.

We do not think this in any way affects the correctness of the legal conclusions by which the appeal was disposed of, but in the interest of accuracy we take notice of the error or oversight and restate the opinion and incorporate in it the unmodified plat which we find in the statement of facts.

P. P. Bond and wife, Gussie Bond, instituted this suit against S. W. Hughes and Frank Mills, Sheriff of Coleman County, to enjoin the sale under execution of certain property at Santa Anna, Texas, claimed by them as their homestead. The defendants answered, alleging that the property if ever homestead had been abandoned as such before levy, etc. They sought to have the property "decreed to be community property of the plaintiffs and subject to the judgment (execution) * * * and that said judgment lien be established and foreclosed * * *." The case was tried on its merits and the temporary injunction made perpetual. The defendants appeal.

The parties will be referred to as in the trial court.

The controlling questions are (1) whether or not the building of the house on the west side of the property which was designated for homestead purposes and the resulting renting of the same was an abandonment of the homestead rights in said property, or any specific part thereof; and (2) whether or not sufficient facts are alleged and proved to show specifically the portion rented and abandoned, if any, so as to enable the court to enter a decree affecting that part.

The property involved is the south 83 feet of lots 7 and 8, block 14, of the town of Santa Anna. The following plat reflects the location, dimensions, etc., of the lots:

Plaintiffs acquired this property April 1, 1918, and occupied it as a family homestead. There was a residence on the east part of the property, or lot 8, and it will be referred to as the "old house." About May, 1920, plaintiff made "improvements and betterments on the home place" which improvements crossed the dividing line of lots 7 and 8. Referring to the residence as later improved, plaintiff testified "as it stands now, part of the house extends over on both lots * * *." This testimony is a bit ambiguous and may have been intended to express what he later states when he testified that "the garage that's on the premises (at present) is a *single building* * * * probably 48 feet east and west and narrow north and south." It extends "over on both lots." This building is used for garages and "in the middle of the building is a little servant's partition" used "in connection with the homestead there." There has never been any partition fence between lots 7 and 8, or any physical demarcation of that boundary.

About December, 1927, a five-room residence was constructed upon the west end of the property (lots 7 and 8). This will be referred to as the new house. According to the plaintiff's testimony, it came to be located and built in this way: For himself, plaintiff testifies, he was unwilling to appropriate any part of the homestead (lots 7 and 8) as a location for the new house. That his wife had about $800 of her separate funds which she desired to invest in the house for the advantages of

the rent to be derived therefrom. That he consented to the building of the house on a part of lot 7 with the understanding that it should not become a part of the real estate and that it should soon thereafter be removed to another lot. That it was "only built for a short time and it was to be moved off." That it had been rented when tenants were available. That he personally contributed but a small amount from his salary to the construction of the building; that he did so at a time when he was solvent and that the house, as such, was to be the separate property of the wife. That as a homestead use he and his family cultivated a garden in the northwest part of said lot 7, using the vegetables, etc., for home consumption. The tenants who testified corroborate such testimony.

He further testified that the bank at Santa Anna, of which he was the cashier, became insolvent and he, in 1932, also became likewise. That as always, it is still the purpose and intention of himself and wife to remove the house from the homestead, and that she has acquired a lot for the same, but that the defendants' judgment, execution, etc., has clouded the title and made it inadvisable or impossible to remove the house until that matter is cleared up. That the "depression" and financial reverses have rendered it impossible for him to carry out the above plans, though they are making preparation to do so. That the wife alone rented the new house, but not the premises about it.

The evidence further shows that to obtain sufficient funds to build the new house, estimated to cost about $2850, plaintiff, P. P. Bond, joined with his wife in the execution of a mechanic's lien against the west 50 feet of said part of lot 7. The obligation recites the funds were procured "to be used * * * in and for the erection, repairs and improvements on our homestead * * *." With the funds herein referred to the new house was constructed on premises unquestionably their homestead down to that date. The above loan was paid off and the mechanic's lien released. That transaction or loan in no way enters into the one out of which this suit grows. The circumstances of that loan and mechanic's lien were proved as bearing upon the issue of abandonment of the homestead, or a part thereof, as well as its bearing, if any, upon the question of segregation of some part of homestead alleged to have been abandoned.

The execution sought to be enjoined is based upon a judgment which defendant Hughes obtained against plaintiff Bond upon a note which he, Hughes, purchased from the liquidating agent of the Farmers National Bank of Cross Plains. Plaintiff's brother was Vice-President of that bank and had "an excess over-draft" therein which the banking authorities required him to remove. That at the instance of said brother he (P. P. Bond) signed the note as an accommodation for his brother that it might be placed in the Cross Plains bank in order to take up the overdraft. That the understanding was his brother should immediately thereafter take up the note. That this was not done, and the bank became insolvent and the note passed into the hands of the liquidating agent of the bank. That defendant Hughes bought the note as "the fragile assets or refuse" of the assets of the failed bank. That it was reduced to a judgment and abstracted in Coleman County and that the amount of the judgment has subsequently been substantially reduced by funds derived from the sale of other property belonging to the plaintiff. There is nothing in the history of the obligation which in any way invalidates the obligation.

It is apparent, however, that the judgment is not based upon an obligation arising by reason of a vendor's lien or mechanic's lien. Consequently neither the judgment nor the execution thereon embraces any definite description of a particular tract of land (less than all) sought to be sold under execution or foreclosed on under abstract of judgment lien. In other words, there is no specific description to be found in a mechanic's lien or other instrument reflecting a constructive segregation of any part of the plaintiff's property (less than all) which may have been abandoned for homestead purposes. The levy is general and upon all of lots 7 and 8 originally acquired.

The defendants nowhere allege that the plaintiffs had theretofore abandoned the west 83 feet by 54 feet of their homestead, which part is especially sought to be foreclosed on. They allege that if it be found a part of the original property was continuously used as a homestead, that "afterwards, plaintiff erected upon the other lot, being the *west lot,* a house; that such house was a permanent improvement and was so erected that the same became a part of the realty; that such house was so erected on or about the first day of January, 1924; that such house was erected for the purpose of renting same to any person or persons for an agreed rental; that the plaintiffs have at all times since the erection of such house on such lot rented and leased the same and have at no time lived in said house or on said portion being the west lot * * * that such house and the property upon which same is located and which is used in connection therewith is in all things subject to execution," etc.

The testimony also shows that the plaintiff and his family in March, 1935, moved from the Santa Anna property to a residence in Abilene. The plaintiff's testimony is to the effect that the removal was temporary and that he merely made temporary rental arrangements for the property here in controversy. That at the time of moving to Abilene, and at all times since, he has entertained the purpose and intention of returning to and resuming the occupancy of said parts of lots 7 and 8 as his homestead. That his move to Abilene was caused by his inability to find work by means of which he was able to support his family at Santa Anna. That he moved to Abilene because he had temporary employment at that place as Rural Supervisor in Resettlement Work. That after such employment gave out he became field representative for the J. I. Case Implement Company and is making preparation to remove to his homestead at Santa Anna where he can as well serve the territory (Wichita section) assigned to him.

In their pleadings, the defendants allege the plaintiffs acquired and established a new homestead at Abilene, thereby working an abandonment of the former one at Santa Anna. The undisputed evidence is that the plaintiffs have not acquired any property or established a new homestead in Abilene.

With the exception of Leroy Stockard, a witness introduced by the defendants, and whose testimony relates merely to measurements and dimensions of property, all the witnesses who testified were introduced by the plaintiffs. The plaintiff's testimony, in general, is a refutation of the claim (asserted by the defendants) that all or any part of the original homestead on lots 7 and 8 was abandoned as such. It goes to the extent of denying that any land around the new house was ever rented in connection with the same. In this respect the testimony reflects the type of case disposed of by the Supreme Court in Newton v. Calhoun et ux., 68 Tex. 451, 4 S.W. 645,

wherein it was stated (page 646): "There was evidence, slight though it may have been, from which the court was authorized to find that, while the houses on the lot were rented to others, the lot was more or less used all the time by the appellees and their family for home purposes."

Disposing of a case involving substantially similar facts, the court in H. P. Drought & Co. v. Stallworth, 45 Tex.Civ. App. 159, 100 S.W. 188, writ refused, used this language (page 189): "The testimony reasonably shows that appellees during the time the houses were rented used a portion of the west lot not occupied by the houses for their chickens, and during the time they had a horse and cow, or either, for a lot, and pasture for same, and in renting the houses they invariably reserved the rights to use the lots for the above purposes."

It is unnecessary to state further the nature of the case or the general testimony bearing upon this phase of the same. Under the law we are required to view the testimony from the standpoint of the plaintiffs in whose favor the trial court has rendered judgment, and in doing so we conclude that the evidence is of such probative force that this court would not be authorized to hold, as a matter of law, that the plaintiffs abandoned their homestead rights in said lots, or any part thereof. Under a liberal view of the testimony the question of abandonment presents merely a fact issue. The trial judge, with all the facts and witnesses before him, has pronounced in favor of the plaintiffs' contentions, and it is the duty of this court to sustain the judgment, which we do, by virtue of the following authorities and others which might be cited. Newton v. Calhoun et al., supra; H. P. Drought & Co. v. Stallworth, supra; Hensley v. Shields, 6 Tex.Civ.App. 136, 25 S.W. 37; Hibbs v. City Nat. Bank of Wichita Falls, Tex.Civ.App., 293 S.W. 350; Shambaugh v. Bellar, Tex.Civ.App., 54 S.W.2d 550; Houston Chronicle Pub. Co. v. Allen, Tex.Civ.App., 70 S.W.2d 482; Scottish American Mort. Co. v. Milner, Tex.Civ.App., 30 S.W.2d 582, 583.

Should we be mistaken in the above conclusion and it be held that there was a permanent renting of a portion of said premises, working a waiver of homestead rights in such portion, or that the plaintiffs had for any reason intentionally and permanently waived or abandoned their homestead rights in the new house and the premises under and surrounding same, then we think the judgment of the trial court must be affirmed upon another ground, namely, that there is no evidence sufficient to show such waiver or abandonment as to any specific portion of the original homestead property. No judgment of foreclosure could be entered or made to operate on any definite part thereof. In this respect, we interpret the defendants' brief to insist on nothing more than an enforcement of an execution and foreclosure of judgment lien on a plot of ground embraced in said part of lot 7, being 54 feet off the west side of same. The prayer is in part "that the injunction be dissolved as to said 54 feet and the improvements thereon * * *," etc.

This ground of affirmance requires a discussion of other phases of the testimony and a brief restatement of some. The lots 7 and 8 have never been divided by fence, or otherwise. Neither has the portion of the original tract (7 and 8) claimed to have been abandoned for homestead uses, ever been marked by a division line, a fence, or other physical objects. The 54 foot tract has never been segregated in fact or constructively. Neither the dimensions of the new house nor the old one are given. If any particular portion of the land surrounding either house has ever been assigned to it the same has not been definitely segregated. The evidentiary matter—that is, the 50 feet off of the west side of lot 7 specified in said mechanic's lien as security for homestead improvements, etc.—is never taken by defendants as the definite plot of ground on which foreclosure is sought. The 75 feet (width of lot) is not taken as a dimension of any abandoned portion of the homestead. It is expressly admitted by defendants that at least 21 feet off of the east part (width) of lot 7 is not claimed to have been so abandoned.

The confusion and uncertainty pertaining to the east boundary of the ground that might be considered appropriate for use with either house is reflected by the following testimony and physical facts. The property when first acquired had a garage situated to the north and west of the old residence and possibly near the dividing line of the two lots. This garage is sometimes referred to as the old garage. It was approached over a driveway from Fourth Street on the east. The testimony is that in 1920 plaintiff Bond improved this garage by extending it toward the west. As improved, he describes it as "one build-

ing probably the total length * * * 48 feet" extending "over on both lots." A part of the structure, as previously noted, was designated "servant's quarters." This building contains three compartments for cars, the old one on the east, and the other two constructed by Bond as "betterments and improvements" on the homestead. Bond used the old garage and also the new ones in connection with the old house, the basis of his homestead claim. The new driveway between the old house and the new approaches the garage from Avenue B and approaches directly the garage opening in the center of that building. When that part of the garage is open, Bond drives directly into it and when the car of the tenant or other person occupies that space, Bond swerves his car to the west and north of the new house and passes into the west opening located on lot 7. According to plaintiff's testimony and while residing in the old house, he has continuously so used the new driveway and the different compartments of the garage.

If the driveway has been so used by plaintiff, and the evidence supports the conclusion, then the driveway, whether embraced in whole or in part in the 54x83 foot plot, would in any event, remain a part of the original homestead in connection with the old house, and its homestead character would not be lost. As said in White v. Cotton, Tex.Civ.App., 72 S.W. 2d 669, 672: "The evidence does not disclose with any certainty what use, if any, the defendants in error have been making of the driveway in connection with their home on Logan street. If the driveway has continued to be used by the defendants in error in connection with their home on Logan street, then its homestead character has not been lost and the paving lien did not attach to it."

To the same effect we cite Blackburn v. Knight, 81 Tex. 326, 16 S.W. 1075.

Be that as it may, the new driveway passes between the two houses and is evidently on some part of lot 7. There is some evidence that the driveway is about eight feet wide. Concerning the driveway and its position on the lots, Leroy Stockard, witness for defendants, testified, as stated in defendants' brief, that "he had measured it from the west line of the driveway to the west line of the property (lots 7 and 8) and that it was exactly 54 feet not including any portion of the driveway." We think the witness's testimony

upon the point uncertain and confusing, but since the defendants insist upon a foreclosure to the extent of 54 feet from the west line of lot 7, and, since this contention is based substantially, if not wholly, upon this witness's testimony, we shall examine it further. At first he did testify that the distance from the west line of lot 7 to the *west line* of the driveway was 54 feet. Later by way of apparent correction, he testified it was 54 feet from the west line of lot 7 to the *east line* of the new driveway. Then he testified that the 54 feet extended to "the east line of the garage." This left his testimony still indefinite and uncertain in that it did not state what he meant by the "east line of the garage." In the testimony the east line of the new portion of the garage appears to be referred to sometimes as the east side of the garage, and in other portions the whole building is treated as a unit and the east side of the old garage referred to doubtless as the east side of the garage. In other words, the "east line of the garage" might mean a common wall between the old garage and the addition thereto (such wall being to the east of the driveway), and it might mean the east wall of the old garage which would be considerably to the rear of the old house, and much farther east of the driveway. In still another part of the witness Stockard's evidence, he seems to testify that the 54 foot point would reach a line running north and south and coinciding with the partition wall between the old garage and the new part thereof. If this be the correct interpretation of his testimony, the north-south line so reached would pass "three or four feet east of the east line of the driveway between the residences." Whereas, his first statement was that it reached the west line of that driveway.

Other witnesses testified that a line running north-south and just 50 feet east of the west line of lot 7 would pass near the east eave of the new house and that four feet farther east such line would pass north and south three or four feet, east of the west side of the driveway,—something near the center of the driveway. The width of the driveway is not definitely shown and it is not segregated or definitely marked other than that the cars running over it leave the ordinary imprint of the tires.

No analysis that we can make of the testimony definitely fixes the location of any north-south line over this property (parts

of 7 and 8) and parallel to the west line of lot 7, to the west of which line it may be said such portions of the original property have been segregated, set aside and abandoned for homestead purposes. At least such fact of abandonment, if any, in connection with the new house constructed thereon does not appear as a matter of law.

If the witnesses had any such line in mind they failed to express themselves in a definite manner. If we accept 54 feet as the distance east of the west line of lot 7 as reaching the point through which an imaginary north-south line would mark the east line of the portion of the original homestead alleged to have been abandoned, then, as stated, that limitation or line is not in any manner constructively or physically separated or segregated, and it would simply amount to our giving credence and conclusive effect to the testimony of the defendants' witness Stockard, who, at the instance of the defendants made some measurements of the property the day before he testified, and whose testimony the trial court may have rejected altogether. This would be purely an arbitrary act. The trial court established no such line in order to separate the property claimed and established to be homestead from that claimed and alleged to have been abandoned as such. This court is without authority to do so. In other words, as held in Real Estate Land Title Co. v. Beryle, Tex.Civ. App., 88 S.W.2d 767, 769, "There is no testimony as to what portion of the lot was used by those renting the house, nor proof as to the size of the houses * * * and there is nothing in the record to enable the court 'to fix any arbitrary line by which the property comprising the homestead could be separated from the rented property.'"

In addition to the Beryle Case and the authorities therein cited, we cite Smith v. Simpson, Tex.Civ.App., 97 S.W.2d 522, writ refused,

We have given careful attention to the authorities cited by the appellant, but we do not believe they are applicable to the facts of this case. The first authority cited is Atwood v. Guaranty Const. Co., Tex.Com.App., 63 S.W.2d 685. In that case the portion of the homestead alleged and shown to have been abandoned was segregated by "fence," etc. The second case cited is Harston v. Langston, Tex.Civ. App., 292 S.W. 648, writ refused. In that case (page 650), "The premises occupied by the tenant [were] well defined." We believe all the authorities cited by the appellant are distinguishable upon this principle. In each the portion of homestead abandonment was segregated and definite.

For the reasons assigned in our original opinion and restated in this one, the judgment of the trial court is affirmed. The disposition heretofore made of the appeal will be unchanged and the judgment originally entered remains unaltered in substance as well as the date. The opinion delivered May 20, 1938, will be withdrawn and this one substituted therefor and for the reasons assigned the appellant's motion for rehearing is overruled.